#23858, #23879-a-SLZ

**2007 SD 52**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

PAMELA McDOWELL,                            Claimant and Appellant,

  v.

CITIBANK,                                   Employer and Appellee,

  and

PLANET INSURANCE COMPANY                    Insurer and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE KATHLEEN CALDWELL
Judge

* * * *

BRIAN L. RADKE
Radke Law Office
Sioux Falls, South Dakota                   Attorney for appellant.

KRISTI GEISLER HOLM of
Davenport, Evans, Hurwitz & Smith
Sioux Falls, South Dakota                   Attorneys for appellees.

* * * *

ARGUED MAY 25, 2006
REASSIGNED FEBRUARY 20, 2007

OPINION FILED **06/06/07**

ZINTER, Justice (on reassignment).

[¶1.]        Pamela McDowell appeals Department of Labor and circuit court decisions denying a petition to reopen her workers' compensation settlement. We affirm.

## Facts and Procedural History

[¶2.]        McDowell started working at Citibank in 1984 or 1985. Part of her duties required typing name changes, address changes, credit line increases, and other information in Citibank's computer system. Between 1989 and 1990, McDowell started to experience pain and tingling in her right arm.

[¶3.]        In 1991, Dr. Walter Carlson, an orthopedic surgeon, diagnosed bilateral carpal tunnel syndrome. Dr. Carlson subsequently performed bilateral carpal tunnel release surgery. After the surgery, McDowell continued to work at Citibank on a full-time basis.

[¶4.]        Thereafter, McDowell began experiencing tingling and pain in both hands. Dr. Carlson referred McDowell to the Mayo Clinic. At Mayo, McDowell was diagnosed with neuropathy of the radial nerve. As a result, she underwent radial nerve release surgery on her right hand. McDowell also continued to receive medical treatment including pain management, lidocaine infusions, physical therapy, and biofeedback. Citibank and its insurer, Planet Insurance Company, paid for McDowell's medical treatment and temporary workers' compensation benefits.

[¶5.]        In 1993, McDowell filed a petition seeking permanent benefits. She alleged that she was permanently and totally disabled. Citibank and McDowell

entered into a settlement agreement in March, 1996.  The agreement acknowledged that McDowell was an employee of Citibank and suffered an injury arising out of and in the course of her employment.  The agreement specifically stated that McDowell believed she was entitled to "all categories of benefits including, but not limited to, *benefits for permanent total disability* pursuant to the odd lot doctrine." (Emphasis added.)

[¶6.]      Notwithstanding her belief, McDowell settled her claim for less than a permanent total disability award.  The 1996 settlement agreement noted that there was a dispute between the parties concerning the extent of McDowell's disability, and it specifically set forth the underlying medical basis for both parties' respective claims.  Section 3 provided:

> Claimant. . . was assigned an impairment rating of five percent (5%) of the right upper extremity by [employer/insurer's medical expert,] Dr. Hoversten.  *A true and correct copy of that rating is attached and incorporated by reference.*  Dr. Schutt[, McDowell's medical expert,] later assigned an impairment rating of forty-five percent (45%), *a copy of which is attached and incorporated by reference.*

(Emphasis added.)

[¶7.]      The medical records reflected that Dr. Hoversten, an orthopedic surgeon, had performed an independent medical examination of McDowell.  Dr. Hoversten opined that McDowell sustained a five percent impairment rating for the upper right extremity and that she was capable of returning to her former work full time and without specific restrictions.  Dr. Schutt was McDowell's treating physician at the Mayo Clinic.  In contrast to Dr. Hoversten, Dr. Schutt assigned a forty-five percent whole body impairment rating.  Dr. Schutt's records also reflected

that McDowell *was "[unable to work and] . . . certainly not able to do that and will not be able to do that now."*

[¶8.]    On February 11, 2003, approximately seven years after settling this disputed claim, McDowell petitioned the Department to reopen.  McDowell alleged that she suffered a change in condition and was again entitled to permanent total disability benefits.  Citibank contested McDowell's petition, and the Department conducted a hearing on the matter.

[¶9.]    The hearing examiner denied McDowell's petition to reopen.  The examiner found that McDowell was, and believed that she was, permanently and totally disabled at the time of the settlement agreement.  In making this finding, the examiner noted that Rick Ostrander, McDowell's own vocational expert, testified that McDowell was permanently and totally disabled at the time of the settlement agreement.  Based on this and other evidence, the hearing examiner found that there was no post-settlement change in McDowell's earning capacity.  In fact, the hearing examiner made sixty-seven findings of fact, almost all of which referred to statements by McDowell, her husband, Ostrander, and McDowell's treating physicians opining that McDowell was permanently and totally disabled both before and after the settlement agreement.  The hearing examiner ruled that McDowell was bound by her admissions and the testimony of her vocational expert.  The hearing examiner ultimately explained that because McDowell was, and knew that she was permanently and totally disabled at the time of settlement, "[it was] impossible [for McDowell] to be more disabled than permanently and totally disabled" at the time of her petition to reopen the settlement.  Because McDowell

failed to establish a change in earning capacity, the hearing examiner did not reach the question whether McDowell suffered a change in condition.

[¶10.]     McDowell appealed to circuit court.  The circuit court affirmed the hearing examiner's findings of fact and conclusions of law.  McDowell now appeals the Department's denial of the petition to reopen the settlement.  McDowell also appeals a number of evidentiary rulings in the administrative proceedings.

## Decision

[¶11.]     Our standard of review on the claim of entitlement to additional workers' compensation is controlled by SDCL 1-26-37.  *See* Kasuske v. Farwell, Ozmun, Kirk & Co., 2006 SD 14, ¶9, 710 NW2d 451, 454 (citing Kassube v. Dakota Logging, 2005 SD 102, ¶25, 705 NW2d 461, 465).  "The Department's factual findings. . . are reviewed under the clearly erroneous standard."  *Id.* (citing Enger v. FMC, 1997 SD 70, ¶10, 565 NW2d 79, 83) (additional citation omitted)).  However, the Department receives no deference on its findings and conclusions based on documentary evidence.  *Id.* (citing Haynes v. Ford, 2004 SD 99, ¶14, 686 NW2d 657, 661) (other citation omitted).  Legal questions are also fully reviewable.  *Id.* at ¶10 (citing *Enger,* 1997 SD 70, ¶10, 565 NW2d at 83).

*Reopening*

[¶12.]     The requirements for reopening a workers' compensation settlement under SDCL 62-7-33[1] are well settled.  Three things must be shown:

---

1.     SDCL 62-7-33 provides:

> Any payment, including medical payments under §62-4-1, and
> disability payments under §62-4-3 if the earnings have substantially

(continued . . .)

> First, the claimant must prove "a change in condition." Second, the claimant must prove that the asserted "change in condition" derives from an injury unknown at the time of settlement or *from a known injury with its disabling character unknown.* Finally, a claimant must prove that the unknown injury is causally connected to employment, or that the unknown disabling character is causally connected to the original, compensable injury.

*Kasuske*, 2006 SD 14 at ¶17, 710 NW2d at 456 (emphasis added). Because the hearing examiner assumed without deciding that McDowell could prove a change in condition, he decided this case on two related questions: whether the alleged change in condition affected McDowell's earning capacity and whether the disabling character of her upper extremities injury was unknown at the time of settlement. In deciding those issues, "the evidence must bear directly upon [a] comparison between the claimant's former *disability* and present *disability*." 8 Arthur Larson and Lex K. Larson, *Larson's Workers' Compensation Law* §131 (2006) (emphasis added).

[¶13.] Because the analysis requires a comparison of McDowell's former and present disabilities, it is important to restate the distinctions between a workplace injury, a worker's post-injury condition, and an occupational disability. It is also important to note how the occupational disability is determined as well as the role

_____

(. . . continued)

changed since the date of injury, made or to be made under this title may be reviewed by the Department of Labor pursuant to §62-7-12 at the written request of the employer or of the employee and on such review payments may be ended, diminished, increased, or awarded subject to the maximum or minimum amounts provided for in this title, if the department finds that a change in the condition of the employee warrants such action. Any case in which there has been a

(continued . . .)

that impairment ratings play in the determination. "'[I]njury' is the . . . act or omission which caused the loss.'" Steinberg v. South Dakota Dept. of Military and Veterans Affairs, 2000 SD 36, ¶10, 607 NW2d 596, 600 (quoting Rosnick v. Marks, 218 Neb 499, 357 NW2d 186, 190 (1984)). "'Condition,' in contrast, is the loss produced by [that] injury; i.e., it is the *result* rather than the cause. The word 'condition' means 'state of being.'" *Id.* (citing Doyle v. Superior Court, 50 CalApp4th 1878, 58 CalRptr2d 476, 481 (1996)) (emphasis in original). Finally, that "condition" may or may not cause a compensable occupational disability. That type of disability is often determined in part by an impairment rating, but the numeric impairment rating is not determinative. Instead, a workers' compensation disability is based on the worker's *occupational* situation. As this Court has often explained:

> The physician who makes a determination about impairment must keep in mind that a permanent impairment rating is not the same as a disability rating. Permanent medical impairment is related directly to the health status of the individual, whereas disability can be determined only within the context of the personal, social, or *occupational demands*, or statutory or regulatory requirements that the individual is unable to meet as a result of the impairment. . . . *[A] hearing examiner should [consider] other evidence, such as the testimony of [plaintiff's] vocational expert regarding loss of employability. . . .*

Cozine v. Midwest Coast Transport, Inc., 454 NW2d 548, 552 (SD 1990) (emphasis added).

───────────────

(. . . continued)
determination of permanent total disability may be reviewed by the department not less than every five years.

[¶14.]        Keeping these distinctions in mind, an injured worker's occupational ability or capacity is of primary importance in considering a petition to reopen a settlement because "[o]ur [workers' compensation] act is designed to compensate an employee or his family for the loss of [the employee's] income-earning ability. . . ." *Caldwell v. John Morrell & Co.,* 489 NW2d 353, 362 (SD 1992). "[W]orkers' compensation laws were designed to compensate for diminishment of a worker's earning capacity. . . ." *Whitney v. AGSCO Dakota,* 453 NW2d 847, 851 (SD 1990). Therefore, "[a]s a general rule, [a change in condition for reopening] must be a change in the physical condition of the employee, *affecting [her] earning capacity.*" *Stender v. City of Miller,* 82 SD 334, 338, 145 NW2d 913, 915 (1966) (citation omitted) (emphasis added) (superseded on other grounds). "This remains the law today." *Whitney*, 453 NW2d at 852.

[¶15.]        In *Welch v. Automotive Co.*, 528 NW2d 406 (SD 1995), this Court considered a similar case that involved an alleged post-settlement change in condition. Unlike McDowell (who failed to even plead a change in condition affecting her earning capacity), Welch argued a well stated claim asserting a "3 percent increase in impairment, increased pain, [and] *inability to find suitable employment, and inability to recover as expected*[.]" *Id*. at 409 (emphasis added). However, at the hearing, Welch testified that he could do the same work as he could when he received his initial benefits. *Id*. at 410. In concluding that Welch "had not experienced [the] substantial change in condition" sufficient to reopen, this Court relied on Welch's testimony conceding that he suffered no change in his work capacity. This Court noted this concession and held:

> Welch admitted that he could do the same work as he could at the time of the [prior settlement]:
>
> > Q. Jim, is there anything you can't do now that you could when you signed the [settlement]?
> >
> > A. Probably about the same.
>
> "[A] party cannot claim the benefit of a version of the facts more favorable than given in testimony." Guthmiller v. South Dakota Dept. of Transp., 502 NW2d 586, 589 (SD 1993).

*Id.*

[¶16.]     Today's petition for reopening must be denied for the same reason. Even if her physical condition changed, McDowell did not plead or prove that her employability or earning capacity had changed since the settlement. Moreover, the hearing examiner not only relied on McDowell's concessions, but he also considered all of the evidence, including the testimony of McDowell's husband, her vocational expert, and evidence from her physicians.[2] These witnesses also confirmed that the nature and extent of McDowell's disability was known at the time of settlement and had not changed after the settlement.

---

2.     The dissent is simply mistaken in assuming that this matter was decided without considering all of the record evidence, including that of the medical providers. *See infra*, ¶¶ 39, 41, 44. On the contrary, in his findings of fact and conclusions of law, the hearing examiner expressly stated that:

> The testimony of Claimant, *her husband, her vocational expert and her medical providers establishes that* even if there had been a change in physical condition, Claimant's ability to work, disability and earning capacity have not been affected since the Compromise Agreement as she was then and is now permanently and totally disabled.

(Emphasis added.)

[¶17.] More specifically, McDowell testified that as early as 1993, when she filed her initial petition for workers' compensation, she was permanently and totally disabled as a result of the 1991 injury. Then, in April 1995, while receiving weekly workers' compensation benefits but before the settlement, McDowell applied for Social Security benefits based solely on the 1991 Citibank injury. She stated on her Social Security application that "I became unable to work because of my disabling condition on December 01, 1991." She specifically contended that the pain from the 1991 injury rendered her completely unemployable: "I can not [*sic*] work because of the pain created by the use of my right hand and arm. The use of my left arm must be paced, if not, numbness and pain flairs up." Based upon her inability to engage in any substantial gainful employment, she was awarded Social Security benefits retroactive to her last date of employment with Citibank in 1992.

[¶18.] McDowell then conceded that her total inability to work continued through 1998. At that time, she was required to recertify entitlement to Social Security disability benefits. In that process, she again confirmed that she remained unable to work solely because of the pain and associated problems in her upper extremities. But most significantly, she specifically denied having "any change (for better or worse) in [her] disabling condition since [she] last reported such information [in April 1995 *prior* to the settlement.]" She indicated that she remained unable to return to work and incapable of any gainful employment.

[¶19.] Notwithstanding this history conclusively establishing that the character of her disability was known and had not changed, she applied to reopen the settlement in February 2000. But, during the 2003 hearing on this petition, she

again conceded that at all relevant times her pain remained severe, chronic, and

sufficiently debilitating to prevent her from working. She first testified that she

had been unable to work before her pre-settlement 1995 application for social

security benefits:

> A. [T]he reason why I applied for Social Security is because I had the work capacities done and Dr. Schutt said I couldn't go back to what I was doing.
> Q. That you couldn't go back to work?
> A. Uh-huh.
> Q. And that was why you applied for Social Security?
> A. Right.
> . . .
> Q. And [the application] explained to the Social Security Administration the reason you believed your condition prevented you from working at that time?
> A. Yes.
> Q. And at that time it is fair to state, isn't it, that you were representing to the Social Security Administration subject to penalty of perjury that you believed your condition made you unable to work, correct?
> A. Correct.

[¶20.]     McDowell then testified that at the time of the March 1996 settlement,

the character of her disability was the same as it was when she applied for Social

Security in 1995. She testified that she was still unable to work, that she had

applied for no other jobs, and that she was still receiving Social Security benefits.

She further testified that when she entered into the settlement agreement in March

of 1996, her inability to work was caused by the same pain from the same injury.

She even conceded that her doctors agreed she could not work.

> Q. Okay. You would agree that the pain you were having in March 1996 [at the time of settlement] was severe, wouldn't you?
> A. Yeah, Yeah.
> Q. In fact, the pain that you had was so severe that it was debilitating. You weren't able to go back to work, right?

A. Yes.
Q. And the reason you couldn't work was because of that pain in your arms from the 1991 injury, right?
A. Right.
Q. Okay. So by your own testimony, at least in March of 1996, the pain in your arms was severe, chronic and debilitating, correct?
A. Correct.
Q. And your doctors supported that, didn't they?
A. Yes.

[¶21.]     Thus, over a period of ten years, in four separate disability proceedings, McDowell consistently maintained that: she knew the disabling character of her disability, she believed she was unemployable, she had not looked for employment, and she remained incapable of any employment because of her pain. Reiterating what this Court ruled in *Welch*: a claimant "'cannot claim the benefit of a version of the *facts* [regarding the change in condition necessary to reopen] more favorable than given in testimony.'" 528 NW2d at 410 (citation omitted) (emphasis added).

[¶22.]     Were McDowell's own assertions of historical fact not sufficient to affirm the hearing examiner and circuit court, the denial of reopening is independently required by McDowell's other witnesses. First, at the 2003 hearing, McDowell's husband corroborated that her pain was severe and unchanged from the time of settlement, that the pain rendered her incapable of working before the settlement, and that she remained unable to work at the time of the hearing.

Q. Okay. And at that point in time in 1996, 1995 and 1996, that this pain that was severe and chronic was preventing her from working?
A. Yes . . .
Q. So it remains severe today?
A. Yes
Q. It remains chronic

-11-

A. Yes
Q. And it's preventing her from working?
A. Yes. . . .

[¶23.]     Second, McDowell's vocational expert testified that the extent of her occupational disability had not changed over the years. After a December 2000 evaluation, Rick Ostrander reported that based upon McDowell's complaints of pain, she was "totally disabled from any type of regular gainful employment, even on a part-time basis." In a second report, dated October 30, 2002, he again opined that she "continues to be totally disabled from any type of employment." And, these post-settlement disability opinions were predicated on a 1995 pre-settlement functional capacity assessment. Consequently, at the reopening hearing, Ostrander testified that McDowell's occupational disability had not changed from the time of settlement: "Well, it's my professional opinion that at the time I saw her and going back to 1995, based on all of the information that was available to me at that time, it's clear that she was not employable and continues to be not employable." Ostrander was unequivocal:

> Q. If I'm correct . . . it was your opinion today that Pam McDowell is not employable just as Pam McDowell was not employable in 1995 based upon the review of the information [McDowell's counsel provided] to you; is that correct?
> A. That's correct.
> Q. And that remains your opinion today?
> A. Yes, it does.
> Q. That in terms of Ms. McDowell's employability, her loss of earning capacity, there has been no change between 1995 and today; is that correct?
> A. That's correct.

Ostrander finally confirmed that even if McDowell had suffered a change in physical condition, that change did not affect her earning capacity:

Q. Okay. Mr. Ostrander, we're going to talk a little bit of hypotheticals. If you would assume with me that Ms. McDowell's condition has changed since 1995 physically.  Assume that with me, okay?
A. Okay.
Q. Would you agree with me based upon what you've reviewed and your knowledge and history of the labor market that that change in her physical condition has not affected negatively her earning capacity since 1995?
A. I would agree.

McDowell is independently bound by this testimony because even if she were not bound by her own sworn statements and testimony, she is not entitled to assert a greater disability than that established by her own vocational expert, who determined disability based upon the medical impairment rating.  See Tischler v. United Parcel Service, 1996 SD 98, ¶56, 552 NW2d 597, 606.

[¶24.]      Third, the medical evidence finally confirmed that McDowell was, and knew that she was, permanently and totally disabled at the time of settlement.  In 1993, Dr. Schutt, her primary treating physician at Mayo, imposed temporary work restrictions due to pain in the upper extremities, and reported that "[s]he certainly is not able to return to work."  McDowell was also told she could not return to work.  Dr. Cooney's report of February 1994, stated: "[a]fter a long discussion and review with Ms. McDowell, I reassured her that her condition is one of continued pain dysfunction that is unlikely to improve dramatically at any short time period."  By 1995, Dr. Schutt reported that: "This patient right now is permanently disabled until we can find out whether there is any more definitive therapy that we can give her to give her relief until maximum medical results."  But following the functional capacity assessment in 1995, Dr. Schutt indicated that McDowell's restrictions permanently precluded her from working as a result of chronic pain.  Dr. Schutt

rated the injury as: "Class 5 - severe limitation of functional capacity" that rendered her incapable of even minimal sedentary activity. This restriction was never lifted by Dr. Schutt, and McDowell has not been employed - or even attempted reemployment - since Dr. Schutt's first work restriction was imposed in 1993, prior to the settlement.

[¶25.]    Thus, McDowell, her husband, her vocational expert, and her treating physician all confirmed that her occupational disability remained unchanged: she was unable to work in any capacity at the time of settlement and at the time reopening was requested. And even if one were to disregard this evidence relating to her actual occupational disability, or even if one misconstrues the meaning of Drs. Schutt's and Hoversten's impairment ratings,[3] this record unequivocally established that McDowell knew the disabling character of her disability at the time of settlement. Simply stated, the fact that she *testified* she was permanently and totally disabled before, at the time of, and after the settlement forecloses her appellate claim that the disabling character of her injury was unknown during those same periods of times. Because McDowell was, and knew that she was, permanently and totally disabled at the time of settlement, the hearing examiner

---

3.    Although there was a disparity between the five percent impairment rating assigned by Dr. Hoversten, and the forty-five percent rating of Dr. Schutt, the physician reports were incorporated into the settlement agreement. Because Dr. Schutt's more detailed report indicated that she was unable to work, McDowell cannot now argue that she did not know her doctor's opinions concerning the disabling character of her injury at the time of settlement. Having had that knowledge at that time, and having specifically released her claim of permanent total disability under that evidence, there is no reason to remand. All of the evidence was already considered, and McDowell must be

(continued . . .)

and circuit court correctly concluded her petition for reopening could not have been granted even if she had established a change in physical condition. *See Kasuske*, 2006 SD 14 at ¶17, 710 NW2d at 456.

*Evidentiary Issues*

[¶26.]    McDowell argues that the Department erred on a number of evidentiary rulings. Evidentiary issues are subject to the abuse of discretion standard of review. Behrens v. Wedmore, 2005 SD 79, ¶63, 698 NW2d 555, 579. Furthermore, "[a]n evidentiary ruling will not be overturned unless error is 'demonstrated . . . [and] shown to be prejudicial error.'" Novak v. McEldowney, 2002 SD 162, ¶7, 655 NW2d 909, 912 (quoting State v. Smith, 1999 SD 83, ¶39, 599 NW2d 344, 353). "Error is prejudicial when, 'in all probability. . . [it] produced some effect upon the final result and affected [some] rights of the party assigning it.'" *Id.* (citation omitted).

[¶27.]    McDowell first claims error because Citibank's former attorney was allowed to testify without producing a letter she had used to refresh her recollection before testifying. Citibank, however, correctly points out that the testimony at issue did not relate to McDowell's claimed change in condition. Further, the letter and the testimony were cumulative. Therefore, even assuming error, McDowell failed to establish that the failure to produce this irrelevant and cumulative evidence was prejudicial.

_____

(. . . continued)
       deemed, as a matter of law, to have had knowledge of her own testimony
       concerning the extent of her disability at the time of the settlement.

[¶28.] McDowell next alleges error in not allowing her to question a witness about a letter between the pre-settlement attorneys that would have supplied a term allegedly omitted from the settlement agreement. Citibank, however, points out that because the hearing examiner found the agreement unambiguous, parol evidence was inadmissible to add new terms. The hearing examiner was correct. *See* Wessington Springs Educ. Assoc. v. Wessington Springs Sch. Dist., 467 NW2d 101, 104 (SD 1991) (noting that extrinsic evidence is unnecessary "[w]hen the terms of [an] agreement are clear and unambiguous, and the agreement actually addresses the subjects that it is expected to cover[.]").

[¶29.] McDowell next alleges error in refusing to allow evidence of awards and bonuses she received from Citibank while employed. Those awards did not, however, have any relevancy to reopening the settlement because they occurred during her employment. Therefore, the ruling was not prejudicial.

[¶30.] McDowell next alleges error in the refusal to admit a calculation of the present value of the future permanent total disability benefits that she would have received had she successfully reopened the settlement. However, Citibank correctly points out that there was absolutely no foundation established for the present value calculation she offered. McDowell has not shown error.

[¶31.] McDowell finally alleges error in the denial of her motion to supplement the record of the administrative proceeding. After the hearing examiner issued his decision, McDowell moved to supplement the administrative record with additional evidence to bolster a point that her expert (Rick Ostrander) had made but was rejected by the hearing examiner. McDowell appealed the

hearing examiner's denial of that request. McDowell then pursued the matter by making two motions under SDCL 1-26-34[4] in circuit court. The circuit court denied both motions finding that McDowell failed to establish that there were good reasons for having failed to offer the evidence at the administrative hearing.

[¶32.] We agree that McDowell failed to demonstrate good cause for her failure to present the evidence at the administrative hearing. McDowell's brief to this Court only states that "[d]uring cross-examination [at the hearing before the hearing examiner, counsel for Citibank], challenged the truthfulness of this testimony. . . . Because the line of questioning came as a surprise, Counsel for Ostrander couldn't make sure Ostrander had the documents with him which would have proven his point." However, there is no question that Ostrander's occupational disability opinion was going to be the central point of McDowell's proof at the hearing. Because McDowell is deemed to be aware of this essential element of her required showing at the administrative hearing, her belated claim of surprise cannot be sustained. *See* Cavender v. Bodily, Inc., 1996 SD 74, ¶15, 550 NW2d 85, 88. Moreover, a party may not wait to submit evidence at an administrative hearing until after the party learns how the hearing examiner will rule. Therefore,

---

4.    SDCL 1-26-34 provides:

> If, before the date set for hearing, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional

(continued . . .)

neither the hearing examiner nor the circuit court erred in denying McDowell's motion to supplement the administrative record.

[¶33.]     For the foregoing reasons, there is no need to reach Citibank's Notice of Review alleging that McDowell failed to establish a change in her "physical condition."

[¶34.]     Affirmed.

[¶35.]     GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, concur.

[¶36.]     SABERS, Justice, dissents.


SABERS, Justice (dissenting).

> **The ALJ erred when it concluded McDowell was bound by her claims and testimony and the testimony of her vocational expert in determining her condition at the time of the agreement and in ignoring all contrary evidence expressly incorporated therein.**

[¶37.]     SDCL 62-7-33 provides an exception to the finality rule in workers' compensation cases and provides in part:

> Any payment, including medical payments under § 62-4-1, and disability payments under § 62-4-3 if the earnings have substantially changed since the date of injury, made or to be made under this title may be reviewed by the Department of Labor pursuant to § 62-7-12 at the written request of the employer or of the employee and on such review payments may be ended, diminished, increased, or awarded subject to the maximum or minimum amounts provided for in this title, if the

_____

(. . . continued)
> evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court.

department finds that a change in the condition of the employee warrants such action. . . .

*See* Kasuske v. Farwell, 2006 SD 14, ¶11, 710 NW2d 451, 454-55. We have set forth three elements a claimant must prove to reopen: (1) a change in condition, (2) that the asserted change in condition derives from an injury unknown at the time of the settlement or from a known injury with its disabling character unknown, and (3) the unknown injury is causally connected to the employment, or that the unknown disabling character is causally connected to the original, compensable injury. *Id.*

¶17. We have defined a change in condition as:

> [A] condition different from that which existed when the award was made. It must be a material and substantial change. As a general rule, it must be a change in the physical condition of the employee, *affecting his [or her] earning capacity.*[5]

Stender v. City of Miller, 82 SD 334, 339, 145 NW2d 913, 915 (1996) (emphasis added) (additional citations omitted). In this case, the ALJ held that any alleged change of condition suffered by McDowell was immaterial because it did not affect her earning capacity.

[¶38.] Professor Larson commented on what issues are relevant in reopening hearings:

> [N]o matter who brings the reopening proceeding, neither party can raise original issues such as work connection, employee or employer status, occurrence of the compensable accident, and degree of disability at the time of the first award.

---

5. A change in condition that does not affect earning capacity but requires additional medical treatment may also be grounds for reopening a previous award. Larsen v. Sioux Falls School District, 509 NW2d 703, 708 (SD 1993).

Arthur Larson, Larson's Workers' Compensation Law § 131.03(2)(b) (2005). In short, "the issue before the Board is sharply restricted to the question of extent of improvement or worsening of the injury on which the original award was based." *Id*. Our cases are consistent with that principle. As we noted in *Kermmoade v. Quality Inn*:

> A settlement of a compensation claim which is properly approved per SDCL 62-7-5 *operates as an adjudication of the facts agreed upon in the settlement* including the employer's obligation to pay compensation. [Citation omitted.] Thus, a matter may not be later reopened absent an express reservation of jurisdiction by Department or a change in the employee's physical condition which change is a result of his working injury.

2000 SD 81, ¶19, 612 NW2d 583, 589 (quoting Larsen v. Sioux Falls Sch. Dist., 509 NW2d 703, 708 (SD 1993)) (emphasis added). S*ee also* Stender, 82 SD at 339, 145 NW2d at 915 (1996) ("On review of an award the inquiry then is limited as to whether disability resulting from the injury may have increased or diminished beyond what the award contemplated."). In some cases, the award or agreement will state the claimant's degree of disability. However, in cases such as this where there was no finding or agreement, *the condition at the time of the settlement must be determined before* it can be established the claimant has suffered a *change in condition*.

[¶39.]     The agreement between the parties in this case acknowledges that McDowell was an employee of Citibank and that she suffered a compensable injury. The parties could not agree as to the degree of McDowell's disability. Instead, the agreement set forth the range of impairment suffered by McDowell. According to Dr. Hoversten, McDowell had only a five percent impairment of her upper right

extremity and was capable of returning to work on a full-time basis. McDowell's treating physician, Dr. Schutt, gave McDowell a forty-five percent disability rating over her entire body and indicated she was not ready to return to work. Both opinions were incorporated into the agreement. Thus, the ALJ was required to examine *all* of the evidence and determine McDowell's degree of disability at the time she entered into the agreement before determining her present degree of disability.

[¶40.] This was a compromise settlement agreement. Citibank's position was that Claimant's disability was limited to five percent and that the Claimant was able to return to work. The settlement was based more on that position than on Claimant's and now Citibank wants to take advantage of Claimant's allegation of permanent and total disability, which Citibank disputed and refused to accept. This is totally unfair and as suggested by Charles Dickens in *Oliver Twist,* if the law permits it, the "law is an ass . . . ."[6]

[¶41.] Rather than focus on all of the evidence, including the opinions and impairment ratings set forth in the agreement, the ALJ made its ruling based on the testimony of McDowell and Ostrander, the vocational specialist. Both McDowell and Ostrander testified that she was unable to work prior to the settlement agreement. The ALJ concluded that McDowell's testimony in this regard constituted admissions. Additionally, the ALJ held that McDowell was bound by her expert's opinion. Thus, the ALJ concluded McDowell was not entitled to any

---

6. Charles Dickens, Oliver Twist, 489 (1970) (First published serially 1837-1839).

additional disability benefits because she was totally and permanently disabled at the time she entered into the agreement.

[¶42.]     Although we have held that a party is entitled to no better version of the facts than their own testimony, *Frey v. Kouf*, 484 NW2d 864, 869 (SD 1992), the Supreme Court of Texas recognized:

> An opinion that would conclusively admit that a[n] [] injury has resulted in a total temporary, total permanent, or merely partial inability to work requires medical knowledge beyond that of the average lay person.

Mendoza v. Fid. & Guar. Ins., 606 SW2d 692, 695 (Tex 1980).  Generally, this Court requires expert testimony before an ALJ may establish a disability rating.  Caldwell v. John Morrell & Co., 489 NW2d 353, 362-63 (SD 1992).

[¶43.]     Therefore, the ALJ's determination that McDowell's claims and testimony and testimony of her vocational expert were dispositive or conclusive of this issue is one sided and flawed.  Likewise, it would be improper for the ALJ to be overly persuaded by the position taken by the employer and insurer at the time of the agreement, and thereby limit McDowell's disability on that basis to a five percent impairment and that she was capable of returning to work on a full-time basis.  Obviously, Claimant's condition at the time of the contested agreement was somewhere between five percent and forty-five percent impairment.

[¶44.]     The proper focus should be to examine *all* of the evidence, including the reports of Dr. Hoversten and Dr. Schutt, which were expressly incorporated into the agreement.  A proper determination must be made, based on all those opinions and impairment ratings, as to McDowell's degree of disability at the time she entered into the settlement agreement before determining whether she has suffered

a change in condition. Whether her condition has diminished since then will be the next question. If McDowell can show a change in condition, the ALJ should then proceed under the final two factors in *Kasuske*, 2006 SD 14, ¶17, 710 NW2d at 456. We should reverse and remand for the Department to make those findings.