#27409, #27420-a-DG
**2015 S.D. 88**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

SARAH SORENSEN,                                    Plaintiff and Appellee,

v.

HARBOR BAR, LLC,                                   Employer and Appellant,

and

MIDWEST FAMILY MUTUAL
INSURANCE COMPANY,                                 Insurer and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MARK BARNETT
Judge

\* \* \* \*

LEE C. "KIT" MCCAHREN of
Olinger, Lovald, McCahren
  & Reimers, P.C.
Pierre, South Dakota                               Attorneys for appellee.


STEVEN J. MORGANS
SHARLA B. SVENNES of
Myers Billion, LLP
Sioux Falls, South Dakota                          Attorneys for appellants.

\* \* \* \*

CONSIDERED ON BRIEFS
ON OCTOBER 5, 2015
OPINION FILED **11/10/15**

GILBERTSON, Chief Justice

[¶1.]      Sarah Sorensen was injured during the scope of her employment at The Harbor Bar (Employer) on December 31, 2009.  Approximately a week later, she complained of a sudden onset of headaches and vomiting, which caused her to undergo brain surgery.  She filed for workers' compensation benefits but was denied, as Employer alleged that her injuries were the result of a different incident on January 4, 2010.  The Department of Labor (Department) conducted a hearing and held that the workplace incident was a major contributing cause of her condition.  Employer appealed this ruling to the circuit court, which affirmed in part and remanded in part for clarification of compensable damages.  After the Department clarified compensable damages, the circuit court affirmed.  We affirm.

## BACKGROUND

[¶2.]      Sarah Sorensen graduated from high school in Watertown.  After high school, Sorensen attended culinary school in Mitchell, but dropped out after a year.  Sorensen moved back to Watertown and began living on her own, and took a position as a waitress at the Harbor Bar in late 2009.

[¶3.]      While Sorensen was working on New Year's Eve in 2009, a fight broke out in the bar among some customers.  Sorensen attempted to break up the fight, and her co-worker Paul Kranz tried to help when he noticed Sorensen getting involved.  While trying to intervene, Kranz saw one of the customers hitting another person while the other lay on the floor.  Kranz pulled the man off, and discovered that Sorensen was the person being attacked.  Sorensen ran to the bathroom to clean herself up, and finished the remainder of her shift.  During her shift, several

people noticed that Sorensen was getting black eyes. She also complained of a headache.

[¶4.] On the morning of January 7, about a week after the assault, Sorensen suffered an onset of severe headaches and vomiting. Her boyfriend took her to the emergency room, and an MRI revealed a massive intraventricular hemorrhage in her brain. She was transported to Sanford Hospital in Sioux Falls, and underwent brain surgery the next day.

[¶5.] Dr. William Asfora was Sorensen's surgeon, and he performed three separate surgeries on her. The first surgery required Dr. Asfora to insert a temporary drainage tube into Sorensen's brain, while the second surgery entailed inserting a permanent drain. During the third surgery, Dr. Asfora connected blood vessels in the scalp to vessels in the inner brain.

[¶6.] Dr. Asfora performed the third surgery after discovering that Sorensen suffered from moyamoya disease, a vascular disease of the brain. It results in the closing of some major blood vessels in the brain, which results in a network of smaller and less stable vessels growing in an attempt to supply the brain with its necessary nutrients. These small, unstable blood vessels make the brain more prone to bleeding and a person with this condition is at greater risk for a major brain bleed. The Department found that the first two surgeries were results of the accident, but that the third surgery was due to the moyamoya disease alone.

[¶7.] On January 3, 2010, the workplace assault was reported to the Watertown Police. The police took pictures of Sorensen's face, which showed that she had a swollen face and two black eyes. Amanda Greeley, Sorensen's co-worker,

saw Sorensen when Sorensen went back to the bar on January 4 to pick up her check. Greeley testified that Sorensen had two black eyes at that time, and was complaining of a headache.

[¶8.]        After the police took the photographs, Detective Timothy Toomey became involved in the investigation of the New Year's Eve assault. Toomey interviewed witnesses to the assault and reviewed Harbor Bar's surveillance footage. This information led to the arrest of Sorensen's attacker.

[¶9.]        On January 27, 2010, a month after the incident, Toomey was contacted by Todd Syhre about another incident that had allegedly taken place at the Harbor Bar. Syhre told Toomey that he and his friend Dave McGuire were at the bar one night when they witnessed Sorensen roughhousing with her boyfriend and brother. Syhre testified that he saw her boyfriend attempt to pick Sorensen up, only to drop her to the floor. Syhre did not see her hit the floor, but thought she fell on her back and could have hit her head. Syhre did not remember the date of this alleged incident. Initially he thought it may have happened prior to December 31, but after calling McGuire, the two decided that the incident took place on January 4.

[¶10.]        Toomey reviewed the surveillance tapes of the bar, but did not see Sorensen in the bar any night between the night of the assault and her admission to the hospital. However, he admitted at the hearing that he did not watch all the tapes, but only portions from each night. After watching the videos and considering what Syhre and McGuire had said, Toomey did not give their stories much weight. He believed they were encouraged to talk to him by Employer, and their inability to

agree upon a date hurt their credibility. At the hearing, the Department found Toomey's testimony to be credible.

[¶11.] Sorensen presented evidence from Dr. Robert Packard, showing her qualifications for Social Security Disability. Packard testified live at the hearing that Sorensen now suffers serious mental defects, such as memory loss. He also testified that she has gained significant weight since the incident, as she has no ability to tell when she is hungry or full. Packard stated that Sorensen is not able to manage her own affairs.

[¶12.] Dr. Asfora, in his video deposition presented to the Department, stated that the workplace accident was a major contributing cause of Sorensen's brain hemorrhage. Her moyamoya disease was asymptomatic prior to the accident, and the punches she suffered were likely the cause of the hemorrhage. He testified that the rotation a person's head experiences when being punched could cause significant bleeding in the brain.

[¶13.] Employer presented the video deposition of Dr. Starzinski as expert testimony. Dr. Starzinski only reviewed the medical records and never treated Sorensen himself. He did not believe the accident was a major contributing cause of the hemorrhage. His opinion was based on the belief that Sorensen was able to continue her normal activities in the days following the accident, and it was only after the alleged second incident that she began to become symptomatic. He testified that an intracranial hemorrhage would be a "show-stopper" that would not allow a person to continue to function normally. Because he believed she had been

able to function normally after the accident, he did not think that the accident was a major contributing cause of the hemorrhage.

[¶14.] During the hearing, Sorensen attempted to present testimony by Dr. Sabow as rebuttal to Dr. Starzinski's testimony. Employer objected, arguing that Dr. Sabow was an undisclosed expert witness. Initially, the Department did not allow Dr. Sabow to testify, but then allowed Sorensen's attorney to question Dr. Sabow as an offer of proof. Dr. Sabow's testimony was extremely brief, as he only answered a few questions. Sorensen's attorney asked him to examine the pictures of Sorensen taken on January 3. Dr. Sabow testified that the picture showed that Sorensen had "raccoon eyes" which can be a sign of intracranial trauma. Dr. Sabow never examined Sorensen personally. Sorensen's attorney argued that the testimony should be allowed as a rebuttal to Employer's claim that there was a second incident that caused the hemorrhage. The Department reconsidered its original position and included the testimony as substantive evidence.

[¶15.] Because of this admission, the Department allowed Employer to retain an additional expert and supplement the record with his testimony. Employer retained Dr. Howard, a neurosurgeon from the University of Iowa. Dr. Howard testified that a neurosurgeon could not diagnose an intracranial hemorrhage solely from "raccoon eyes" in a photograph.

[¶16.] The Department ruled in favor of Sorensen, finding that the work-related injury was a major contributing cause of the hemorrhage and resulting disabilities. The Department also found that the alleged second incident did not take place after the work-place assault as Employer claimed, if it happened at all.

It also found that the first two surgeries performed by Dr. Asfora were compensable as a result of the injury, but that the third surgery was exclusively the result of Sorensen's moyamoya disease and thus not compensable. The Department awarded Sorensen her expenses for medical bills and lost income.

[¶17.]     Employer appealed the decision to the circuit court, which affirmed on causation and compensation but remanded to the Department for clarification on which medical expenses were compensable.* This was because the Department had found that the third surgery was not the result of the work-place injury, but still directed Employer to pay for the third surgery when it issued its findings of fact and conclusions of law. The Department clarified its holding, thus reducing Sorensen's award. The circuit court issued a final order after remand with the adjusted award.

[¶18.]     Employer appeals, raising the following issues:

1.     Whether the Department was clearly erroneous in its finding that the alleged second incident actually happened before the work-place incident, if it happened at all.

2.     Whether the Department was clearly erroneous in its determination that the work-related injury was a major contributing cause of Sorensen's intracranial hemorrhage.

---

\*     This decision was released in July 2014. Sorensen claims that we do not have jurisdiction over this case because Employer did not appeal within the allotted time, arguing that this initial circuit court decision was what should have been appealed. However, we only have jurisdiction over final judgments. SDCL 15-26A-3. This judgment was not final, as the circuit court remanded on the issue of damages. *See Midcom, Inc., v. Oehlerking*, 2006 S.D. 87, ¶ 11, 722 N.W.2d 722, 725 (holding that a judgment must completely adjudicate all of the issues of fact and law in a case to be final). As the circuit court did not issue a final judgment until its Final Order After Remand, and Employer properly appealed that order within the allotted time, we have jurisdiction over this matter.

> 3. Whether the Department abused its discretion by admitting Dr. Sabow's undisclosed testimony as rebuttal testimony.

## STANDARD OF REVIEW

[¶19.] We review an agency's findings of fact under the clearly erroneous standard. SDCL 1-26-36; *Foley v. State ex rel. S.D. Real Estate Comm'n*, 1999 S.D. 101, ¶ 6, 598 N.W.2d 217, 219 (citations omitted). We afford "great weight to the findings and inferences made by the Department on factual questions." *Wagaman v. Sioux Falls Constr.*, 1998 S.D. 27, 576 N.W.2d 237, 240. Our question is not whether we would have made the same findings as the trial court, but whether we have a "definite and firm conviction that a mistake has been made." *Isack v. Acquity*, 2014 S.D. 40, ¶ 7, 850 N.W.2d 822, 825 (*quoting Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 16, 790 N.W.2d 52, 59). "We do not substitute our judgment for the Department's on the weight of the evidence or the credibility of witnesses." *Gerlach v. State*, 2008 S.D. 25, ¶ 6, 747 N.W.2d 662, 664 (citations omitted).

[¶20.] When reviewing an agency's evidentiary rulings, we examine whether the agency abused its discretion. *McDowell v. Citibank*, 2007 S.D. 52, ¶ 26, 734 N.W.2d 1, 10. An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850. However, even if the agency did abuse its discretion, we will not overturn unless the abuse produced some prejudicial effect. *McDowell*, 2007 S.D. 52, ¶ 26, 734 N.W.2d at 10.

**DECISION**

[¶21.]     1.   *Whether the Department was clearly erroneous in its finding that the alleged second incident actually happened before the work-place incident, if it happened at all.*

[¶22.]     Employer first argues that the Department was clearly erroneous in its finding that the alleged second incident happened before the work-place incident, if it happened at all. Employer points to the testimony of several witnesses that believed they saw Sorensen at the bar on January 4, and saw her boyfriend drop her on her back. Employer does not consider relevant the fact that these witnesses could not remember Sorensen having black eyes, as it claims it was dark in the bar and she was likely wearing makeup. Employer also argues that we should discount Detective Toomey's testimony that he did not see Sorensen on the tapes because he did not watch all of the tapes.

[¶23.]     The Department made a finding that Toomey's testimony was credible. While it did not explicitly find that the other witnesses were not credible, Toomey's doubts about their testimonies are implied in the Department's decision to find him credible. Toomey testified that he doubted both the witness's motives and recollections, considering they only approached him weeks after Sorensen had already been admitted to the hospital. The Department also found it significant that none of these witnesses could remember if Sorensen had black eyes when they saw her in the bar. The police took pictures of Sorensen on January 3 that show she had very apparent bruising on her face, and the Department found it unlikely that witnesses would not remember this.

[¶24.]     There is ample evidence in the record to support the Department's finding that the alleged second incident did not occur after the work-place incident,

if it occurred at all. The Department was present at the hearing and heard the testimony. We will not substitute our judgment for that of the Department. *Gerlach*, 2008 S.D. 25, ¶ 6, 747 N.W.2d at 664. The Department's finding was not clearly erroneous.

[¶25.]      2.      *Whether the Department was clearly erroneous in its determination that the work-related injury was a major contributing cause of Sorensen's intracranial hemorrhage.*

[¶26.]      Employer also argues that the Department was clearly erroneous by determining that the work-place injury was a major contributing cause of the hemorrhage. Employer puts forth several arguments to support this contention. The Department determined that the work-place assault was a major contributing cause because she suffered a brain contusion. Employer argues that the contusion cannot suffice for causation because Sorensen did not present symptoms of a brain bleed until seven days after the fight. Employer's expert, Dr. Starzinski, opined that an intracranial hemorrhage such as Sorensen's would be a "show-stopper" and that a person would not be able to function as Sorensen did until she was admitted to the hospital a week after the fight. Dr. Starzinski also believed that Sorensen's moyamoya disease could have been the cause of the bleed.

[¶27.]      All of the above arguments may be true, but it is not our place to verify them. That is the proper function of the fact finder, not the reviewing court. Dr. Asfora testified that the work-place injury was a major contributing cause of the brain bleed. He acknowledged Sorensen's preexisting moyamoya disease, but believed the work-place assault to have been a major contributing cause because

she had previously been asymptomatic. This testimony supports the circuit court's holding and it is not clearly erroneous.

[¶28.] Employer argues that we should discount Dr. Asfora's testimony because he was unaware of the second incident, and thus his opinion was based on faulty information. As we have already affirmed the Department's finding that the second incident did not occur, we will not afford Dr. Asfora's testimony any less weight. The opinion of the treating physician supports Sorensen's claim that the work-place injury caused her disability. We thus hold the Department's decision to be well supported in the record and not clearly erroneous.

[¶29.] 3. *Whether the Department abused its discretion by admitting Dr. Sabow's undisclosed testimony as rebuttal testimony.*

[¶30.] Employer also argues that the Department abused its discretion when it admitted the testimony of Dr. Sabow, who Sorensen called in rebuttal to the testimony of Dr. Starzinski. The Department has the authority to issue sanctions pursuant to SDCL 15-6-37(b), such as the exclusion of evidence, if the parties do not follow its procedures. ARSD 47:03:01:05.02. *See also Schrader v. Tjarks*, 522 N.W.2d 205, 210 (S.D. 1994) (discussing exclusion of testimony as a possible sanction for a party's failure to comply with discovery rules). However, discovery rules are meant to promote, not stifle, the truth-finding process. *Schrader*, 522 N.W.2d at 210. The sanction must also be appropriate in light of the equities involved in the case. *Id.*

[¶31.] Rebuttal evidence explains, contradicts, or refutes evidence of the defendant. *Id.* at 209. It is meant to cut down defendant's case, not merely bolster the plaintiff's. *Id.* Disclosure of rebuttal witnesses has never been required in

South Dakota by statute, rule, or caselaw. *See Schrader*, 522 N.W.2d at 209, ("Neither statute or rules, nor South Dakota precedent require disclosure of rebuttal witnesses"). In *Schrader*, we held that a trial court abused its discretion when it excluded the testimony of three rebuttal expert witnesses. *Id.* We held that because the party that failed to disclose did not do so out of bad faith, and that because exclusion of testimony should be a last resort, the trial court should have admitted the evidence. *Id.* The party did eventually disclose his expert rebuttal witness prior to trial, but at a time that the opposing party still believed improper.

[¶32.]     This case shares similarities with *Schrader*, and its differences are not dispositive. There is no evidence in this case of bad faith on the part of Sorensen. The record indicates that there was at least a misunderstanding about disclosure requirements between Sorensen's attorney and the Department, and it is possible that the Department informed Sorensen's attorney that he did not need to disclose his rebuttal witnesses. The record contains a prehearing scheduling order that included a deadline for expert witness disclosure, but it does not mention rebuttal witnesses specifically. While the attorney in *Schrader* did eventually disclose his rebuttal witness, Sorensen's failure to do so in this case does not appear to be out of bad faith. Excluding Dr. Sabow's testimony in this case due to lack of disclosure would only have stifled the Department's truth-finding process.

[¶33.]     Employer argues that Dr. Sabow's testimony is not rebuttal testimony at all because Dr. Starzinski's deposition was taken months before, and Sorensen's counsel had a video copy in his possession prior to the hearing. However, that does not mean Dr. Sabow's testimony cannot be rebuttal testimony. Rebuttal testimony

is testimony that contradicts the defendant's evidence. *Schrader*, 522 N.W.2d at 209. In this case, Sorensen's attorney called Dr. Sabow not to show that the workplace incident was the cause of the trauma, but to show that the alleged second incident was not the cause. Sabow's testimony supported the idea that Sorensen could not have had "raccoon eyes" on January 3 if the trauma was caused by the alleged second incident on January 4. The Department heard Dr. Sabow's brief testimony, and held that it was proper rebuttal testimony. Excluding the testimony at that point would only have hindered the truth-seeking process. The Department's decision to admit the testimony as substantive evidence was well within its discretion.

[¶34.] Even if we were to hold that the Department abused its discretion in admitting Dr. Sabow's testimony, it would not merit reversal or remand. Employer would still have to show prejudice. The Department admitted Dr. Sabow's testimony, but allowed Employer time to supplement the record with additional expert testimony to refute Dr. Sabow's opinion. Employer argues that this was insufficient, that the video deposition of Dr. Howard added to the record could not compare to Dr. Sabow's live testimony. However, the fact that Dr. Sabow's testimony was live is of little effect, as it was extremely brief and not very technical. Dr. Howard's video deposition was a sufficient opportunity for Employer to refute Dr. Sabow's testimony. The additional expert testimony mitigated any prejudice to Employer by allowing Dr. Sabow's undisclosed testimony.

**CONCLUSION**

[¶35.] We hold that the Department was not clearly erroneous in finding that there was no second incident or in finding that the work-place injury was a major contributing cause to Sorensen's injury and disability. We also hold that the Department did not abuse its discretion in admitting the undisclosed testimony of Dr. Sabow. We accordingly affirm the ruling of the circuit court.

[¶36.] ZINTER, SEVERSON, WILBUR, and KERN, Justices, concur.